UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

EUGENE A. FISCHER,

                    Plaintiff,

v.                                         Case No.  5:06-cv-407-Oc-10GRJ

FEDERAL BUREAU OF
PRISONS, et al.,

                    Defendants.

_____

## ORDER GRANTING SUMMARY JUDGMENT

Plaintiff, a former prisoner at FCC Coleman, commenced this case by filing, through counsel, a prisoner civil rights complaint (Doc. 1) pursuant to the Federal Tort Claims Act (FTCA).[1]   Plaintiff also asserted Eighth Amendment deliberate-indifference and negligence claims, which the court construed as being made pursuant to Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics.[2]   The Parties consented to the exercise of jurisdiction by a United States Magistrate Judge, and the case was referred to the undersigned for all proceedings pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  See Doc. 21.  Pursuant to Defendants' first Motion to Dismiss, or Alternatively for Summary Judgment (Doc. 7), the Court dismissed Plaintiff's FTCA claims and Plaintiff's official-capacity claims against the Bureau of Prisons and Warden Tracy Johns.  Doc. 24.  The Court also dismissed the Complaint to the extent that

---

[1] 28 U.S.C. § 2671, et seq.

[2] 403 U.S. 388 (1971) (authorizing civil rights suits against individual federal officials). Although Plaintiff alleges that his constitutional claims are made pursuant to 42 U.S.C. § 1983e, because Plaintiff is a federal prisoner asserting constitutional claims against federal officials the Complaint is properly construed pursuant to Bivens.

Plaintiff sought to assert only negligence claims.  Id.  However, because Plaintiff's deliberate-indifference and negligence claims against Dr. Mark Tidwell were interwoven and required clarification, the Court directed Plaintiff to file an Amended Complaint containing only his deliberate-indifference claims against Dr. Mark Tidwell.  Doc. 24. Plaintiff filed an Amended Complaint, and the case is now before the Court pursuant to Defendant Tidwell's Motion to Dismiss or in the alternative for Summary Judgment (Doc. 32).  For the following reasons, the Court concludes that the Defendant is entitled to summary judgment.

## I. Allegations of the Amended Complaint

Plaintiff alleges that the Court has jurisdiction over his claims pursuant to the Prison Litigation Reform Act, 42 U.S.C. § 1997e.  Doc. 26.  The factual allegations of the Amended Complaint may be summarized as follows.  In 1998, Plaintiff was diagnosed with benign prostate hyperplasia (BPH).  Prostate biopsies in 1998, 2002, and 2004 revealed benign prostate enlargement.  By 2002, Plaintiff alleges that he was suffering "severe" obstructive symptoms due to BPH.

In June 2004, Plaintiff's symptoms were worsening to include severe obstruction of the urinary tract.  Defendant Dr. Mark Tidwell, the medical officer for FCC Coleman-USP where Plaintiff was then incarcerated, referred Plaintiff to the Urology Center of Florida.  Plaintiff alleges that tests conducted at the Center confirmed "an extremely enlarged prostate, which, if it was still non-malignant (benign), must immediately be reduced by a medical procedure."  Id.  Plaintiff alleges that the Center's physician, Dr. Ira Klinberg, recommended a procedure called "Greenlight PVP" to be done immediately to reduce the prostate.  Id.   Plaintiff was catheterized and returned to

2

Coleman, allegedly with a warning that failure to reduce the prostate could lead to kidney failure.

At Coleman, Dr. Tidwell directed removal of the catheter.  Over the next several months, Plaintiff submitted cop-outs requesting prostate surgery.  Defendant responded that Plaintiff would be placed on call-out and seen in the prison's chronic care clinic.

In October 2004, Plaintiff was sent back to the Urology Center for a prostate biopsy.  Plaintiff had been taken off of coumadin, a blood-thinner, prior to the biopsy. Upon Plaintiff's return to Coleman, he  was put back on coumadin.  Plaintiff alleges that no blood testing was performed in connection with this treatment.  Although Plaintiff previously had been seen by the prison's coumadin clinic for blood testing, Plaintiff alleges that the clinic had been suspended.

Plaintiff alleges that in late October and/or early November 2004, Plaintiff began to experience symptoms including constipation, dizziness, and blood in his urine. Plaintiff was seen at sick-call and given a stool softener.  On the morning of November 20, 2004, Plaintiff alleges that he collapsed in his cell in a pool of blood.  Plaintiff was transported by ambulance to Leesburg Regional Medical Center.  Plaintiff was placed in intensive care and diagnosed with renal failure and hemorrhaging; he was treated with dialysis and other measures.  Plaintiff was discharged and returned to Coleman on December 14, 2004.  Plaintiff's discharge summaries included a diagnosis of "chronic renal failure secondary to obstructive uropathy, urinary obstruction, obstructive uropathy, and urinary retention," and recommended monitoring of his non-functioning right kidney and follow-up with a urologist for prostate removal.

Plaintiff alleges that reports from six different physicians at Leesburg state that

3

Plaintiff had urinary retention due to an enlarged prostate, and that the consensus of the physicians was that high levels of INR [a measure of anticoagulant] in Plaintiff's blood resulted from the effects of coumadin and caused massive hemorrhaging of his kidneys. According to Plaintiff, such hemorrhaging was a secondary effect due to Plaintiff's enlarged prostate.   Plaintiff alleges that all six physicians stated that Plaintiff needed a transurethral resection of the prostate (TURP).

After returning to Coleman, Plaintiff was confined to a wheelchair and remained catheterized.  In February 2005, Dr. Tidwell began treating Plaintiff with epoetin and an iron supplement for anemia.  In late February 2005, Plaintiff returned to the Urology Center for laser prostate surgery.  Following his return to Coleman, Dr. Tidwell continued treating Plaintiff with epoetin and also began treating him with heparin to prevent blood clotting in Plaintiff's legs.  Initially, INR blood testing was performed but subsequently was discontinued.

In September 2005, Plaintiff saw Dr. Tidwell and complained of intense pain in his left leg.  According to Plaintiff, Dr. Tidwell diagnosed an infection and prescribed an antibiotic.   Shortly thereafter, another physician at Coleman, Dr. Green, diagnosed Plaintiff as having blood clotting in his legs.  Dr. Green discontinued the epoetin and iron pills and increased Plaintiff's heparin dosage.  Plaintiff alleges that for the next four weeks he was in great pain, confined to a wheelchair, and had deteriorating kidney function.  Although his condition improved during the fifth week, his legs remained swollen and he could not walk.  Dr. Green advised that the condition was due to blood vessel damage in Plaintiff's legs.

Subsequently, Dr. Tidwell resumed treating Plaintiff with coumadin.   When

4

Plaintiff's legs did not improve, Dr. Tidwell prescribed a diuretic for Plaintiff to decrease water retention.  Plaintiff alleges that special support stockings and a compression machine were ordered but never provided to him.  Plaintiff alleges that in November 2005 Dr. Tidwell told him that he might never be able to walk properly.  By the end of 2005, Plaintiff was experiencing recurring infections in his legs, which he alleges were not treated from December 2005 to March 2006.  At that time, a new Physician's Assistant (PA) arrived at Coleman and Plaintiff began receiving daily treatment for the infection.

## II. Plaintiff's Legal Claims

Plaintiff contends that Defendant was deliberately indifferent to his serious medical needs in violation of his rights under the Eighth Amendment.  Plaintiff alleges that Defendant intentionally failed to perform proper blood testing, and intentionally delayed or failed to provide necessary treatment for Plaintiff's prostate condition. Plaintiff alleges that Defendant failed to properly monitor his blood functions, and that improper use of epoetin caused massive blood clotting in Plaintiff's legs, causing permanent damage.  Plaintiff alleges that timely treatment of the blood clots would have mitigated or reversed the damage to his legs, and that failure to do so constitutes deliberate indifference.

## III. Defendants' Motion to Dismiss or for Summary Judgment

The Defendant argues in the instant Motion to Dismiss or for Summary Judgment (Doc. 32) that the Complaint should be dismissed because: (1) Plaintiff failed to exhaust administrative remedies regarding his claims stemming from blood clots in his legs and claims that, following his surgery in February 2005, he was improperly treated with

epoetin; (2) Plaintiff has failed to assert a proper jurisdictional basis for the Complaint, because the PLRA does not provide an independent basis for jurisdiction; (3) the Complaint fails to state a claim for deliberate indifference upon which relief may be granted; (4) the declaration of Defendant and Plaintiff's medical records establish that Defendant was not deliberately indifferent to Plaintiff's serious medical needs, and thus summary judgment is proper; and (5) Defendant is entitled to qualified immunity from suit, and thus summary judgment is proper.

## IV. **Threshold Considerations**

### A. **Jurisdiction**

The Court agrees that, contrary to Plaintiff's assertion in the Amended Complaint, the Prison Litigation Reform Act (PLRA) does not provide a jurisdictional basis for Plaintiff's claims.[3]  As the Court previously explained, the Court construes Plaintiff's constitutional claims as arising under Bivens.  See Doc. 24.  Although Plaintiff should have cited the correct jurisdictional basis in the Amended Complaint, the Court concludes that in light of its prior determination that jurisdiction is properly founded on Bivens, dismissal for Plaintiff's failure to cite Bivens in the Amended Complaint would not be appropriate.

### B. **Exhaustion of Remedies**

The Court previously concluded that Plaintiff's administrative remedy requests were sufficient to put the Defendant on notice as to the nature of Plaintiff's claims

---

[3] The requirements of the PLRA are intended to discourage the filing of frivolous prisoner lawsuits; it does not create a separate jurisdictional basis for such lawsuits.  See  42 U.S.C. § 1997e; Woodford v. Ngo, 548 U.S. 81, 97 (2006).

asserted in this case, and therefore satisfied the policy concerns outlined in Alexander v. Hawk, 159 F.3d 1321, 1325 (11th Cir. 1998).  In the instant motion, Defendant reasserts the argument that Plaintiff failed to administratively exhaust all of the claims in the Amended Complaint because Plaintiff pursued no administrative remedies subsequent to the denial of his Central Office appeal in November 2005.  See Doc. 32. The Court concludes that it is unnecessary to revisit the exhaustion issue, because even if some of Plaintiff's deliberate-indifference claims arguably are beyond the scope of his administrative remedy requests, Plaintiff in any event is entitled to no relief on any of his claims, and such claims may be dismissed notwithstanding the failure to fully exhaust his administrative remedies.  See 42 U.S.C. § 1997e(c)(2).

### V. Summary Judgment Standard

Under the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. Rule 56(c).  In applying the standard for summary judgment, the Court must review all the evidence "in the light most favorable to the nonmoving party."[4]  The Court must avoid weighing the evidence or determining the truth and limit its inquiry solely to a determination of whether genuine issues of triable fact exist. [5]

In Celotex, the Supreme Court held that the moving party bears the initial burden

---

[4] Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

[5] Anderson v. Liberty Lobby, 477 U.S. 242  (1986).

7

of informing the Court of the basis for the motion and of establishing the nonexistence of genuine issues of fact.[6]  If the Court finds that the movant has satisfied the initial burden, the burden shifts to the non-moving party to provide sufficient evidence of every element he or she is required to prove at trial.[7]  If the party who has the burden of proof at trial fails to establish even one essential element of the case, "there can be no genuine issue as to any material fact" because the failure to establish one essential element "renders all other facts immaterial." Id.  The nonmoving party must go "beyond the pleadings, [and show] that there exist genuine issues of material fact."[8]

## VI. **Eighth Amendment Claims**

The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishments."  "Prison personnel may not subject inmates to acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs . . . .  [S]uch deliberate indifference by a correctional system to the serious medical needs of its prisoners constitutes the kind of unnecessary and wanton infliction of pain that is proscribed by the Eighth Amendment." Harris v. Thigpen, 941 F.2d 1495, 1504-1505 (11th Cir. 1991) (citations omitted).   In Estelle v. Gamble, 429 U.S. 97, 105-06 (1976), the Supreme Court explained that:

> [A] complaint that a physician has been negligent in
> diagnosing or treating a medical condition does not state a
> valid claim of medical mistreatment under the Eighth

---

[6] Celotex, 477 U.S. at 323.

[7] Hairston v. Gainesville Sun Pub. Co., 9 F.3d 913, 918 (11th Cir. 1993), reh'g and reh'g en banc denied, 16 F.3d 1233 (11th Cir. 1994).

[8] Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 1355-56 (1986).

> Amendment.  Medical malpractice does not become a
> constitutional violation merely because the victim is a
> prisoner.  In order to state a cognizable claim, a prisoner
> must allege acts or omissions sufficiently harmful to
> evidence deliberate indifference to serious medical needs.  It
> is only such indifference that can offend 'evolving standards
> of decency' in violation of the Eighth Amendment.

"In order to prove deliberate indifference a prisoner must shoulder three burdens."  Goebert v. Lee County, 510 F.3rd 1312, 1326 (11th Cir. 2007).   First, the Plaintiff must satisfy an objective component by demonstrating that he had a serious medical need.  Id.  (citing Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir.2005) (per curiam)). Second, the Plaintiff must satisfy a subjective component by showing that the prison official acted with deliberate indifference to such serious medical need.  Id. Third, Plaintiff must show that the injury was caused by the defendant's wrongful conduct.  Id. (citing Hale v. Tallapoosa County, 50 F.3d 1579, 1582 (11th Cir.1995)). "A medical need that is serious enough to satisfy the objective component 'is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir.1994)).

The subjective aspect of the test for an Eighth Amendment violation "requires a showing that a prison official acted with deliberate indifference to the prisoner's serious medical need."  Id. (citing Bozeman, 422 F.3d at 1272).  To establish deliberate indifference, "'[p]laintiff must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence.'"  Id.   "Whether a particular defendant has subjective knowledge of the risk of serious harm is a question of fact 'subject to demonstration in the usual ways,

9

including inference from circumstantial evidence, and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" Id. (quoting Farmer v. Brennan, 511 U.S. 825, 842 (1994)).  "Disregard of the risk is also a question of fact that can be shown by standard methods." Id.

"The meaning of 'more than gross negligence' is not self-evident but past decisions have developed the concept. In cases that turn on the delay in providing medical care, rather than the type of medical care provided, we have set out some factors to guide our analysis. Where the prisoner has suffered increased physical injury due to the delay, we have consistently considered: (1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay."  Id.

"The final requirement for a deliberate indifference claim is that a defendant have a causal connection to the constitutional harm."  Id. (citing  Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir.2003)).  "Causation, of course, can be shown by personal participation in the constitutional violation."  Id. (citing Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir.1986)).

## VII.  Defendant's Summary Judgment Evidence

Defendant does not dispute that Plaintiff's medical needs were "serious."  Thus, the inquiry into whether Plaintiff's Eighth Amendment rights were violated proceeds to the second step of the analysis, in which Plaintiff must satisfy the subjective component by showing that Dr. Tidwell acted with deliberate indifference to his serious medical needs.  See Goebert, 510 F.3rd at 1326.

Defendant argues that the evidence does not establish deliberate indifference.

10

For support, Defendant points to Plaintiff's medical records and Dr. Tidwell's sworn declaration.  See Doc. 32 exh. 2 (declaration) and exh. 3 (medical records).  In particular, Dr. Tidwell's declaration reflects the following:

Dr. Tidwell was the Clinical Director for USP-1 in May 2003 when he first examined Plaintiff.  At that time, Dr. Tidwell advised Plaintiff that he might require surgery for his prostate condition.  In June 2003, Dr. Tidwell reviewed Plaintiff's lab results and noted that Plaintiff did not at that time need a urology consult, but probably would require a transurethral resection of the prostate (TURP) in the future.   Dr. Tidwell started a coumadin clinic at Coleman to monitor the blood level of the anticoagulent in prisoners taking that medication, including Plaintiff.  Plaintiff had been prescribed coumadin regularly since being diagnosed with deep venous thrombosis (DVTs) in 1996.  However, Dr. Tidwell was not directly involved in the routine blood testing of chronic patients; the clinic was run by mid-level practitioners.

Plaintiff received medical care and follow-up from Dr. Tidwell and other physicians through the coumadin clinic and other clinic and sick call visits by Plaintiff. Dr, Tidwell evaluated Plaintiff on 9/11/03, 10/9/03, 12/9/03, 12/19/03, 12/19/03, 12/23/03, 1/5/04, 2/23/04, 3/11/04, 4/20/04, and 6/8/04.  In June 2004, Dr. Tidwell noted that Plaintiff's creatinine levels were increasing and recommended a urology consultation.  The recommendation was approved by the facility's Utilization Review Committee, and an appointment was requested on June 29, 2004.

On September 13, 2004, Plaintiff saw Dr. Klimberg, the urologist.  The consult included cytoscopy and insertion of a Foley catheter.  A biopsy could not be performed because Plaintiff was on coumadin, which increased the risk of excessive bleeding.

11

When Plaintiff returned from the consult, Dr. Tidwell requested consults for a prostate biopsy and a transrectal ultrasound (TRUS) (prostate ultrasound).  Dr. Tidwell noted that the urologist recommended Greenlight PVP "provided the biopsy was negative." There was no instruction to maintain the Foley catheter, so Dr. Tidwell discontinued the catheter to decrease the risk of a urinary tract infection.  The only recommendation on the TRUS report was "[p]rostate biopsy to rule out prostate cancer."

Plaintiff was taken off of coumadin so he could have the biopsy on October 18, 2004.  The urologist did not insert a catheter.  Post-operative instructions advised Plaintiff to resume taking coumadin following the biopsy.  Between October 18 and November 20, 2004, Plaintiff was seen by medical personnel on multiple occasions.  On November 8, 2004, Dr. Tidwell saw Plaintiff regarding complaints of dysuria and difficulty with defecation.   Dr. Tidwell prescribed medication and noted his plan to discuss Plaintiff's case with the urologist after the biopsy results were received.  The negative biopsy results were received on November 10.

On Saturday, November 20, 2004, Plaintiff was seen by medical staff for complaints of weakness and blood in his urine.  The medical staff consulted with Dr. Tidwell via telephone, and he prescribed an antibiotic for Plaintiff and scheduled Plaintiff to see him the following Monday morning.  Plaintiff was again seen by medical staff later on November 20, complaining of dizziness, incontinence, and weakness and nausea. Dr. Tidwell, via telephone consultation, ordered Plaintiff sent to Leesburg Regional Medical Center (LRMC) by ambulance.

At LRMC, Plaintiff was treated for a retroperitoneal bleed due to his blood being thin, secondary to use of coumadin.  Plaintiff was found to have abdominal pain,

12

anemia, renal failure, low blood pressure, hematuria, urinary tract infection, leukocytosis, possible sepsis, coumadin toxicity, and right side pleural effusion.

According to Dr. Tidwell, Plaintiff's hospitalization was necessitated by complications with his anticoagulopathy treatment which led to a retroperitoneal bleed secondary to coagulopathy, which resulted in further complications, including acute renal failure.  Dr. Tidwell states that Plaintiff's medical emergency was not precipitated by any obstruction of his urethra due to his prostate problem.

Plaintiff returned to Coleman on December 14, 2004.  On December 21, 2004, Plaintiff had no complaints and indicated he was feeling better and stronger.  Dr. Tidwell observed edema in Plaintiff's left leg, and advised Plaintiff that he would have the Greenlight PVP for his prostate when he was stable.

On January 18, 2005, Plaintiff received the Greenlight PVP and a Foley catheter was inserted.  Plaintiff returned to Coleman with instructions that there was a "catheter in place" and that he would be scheduled for catheter removal.  The urologist also recommended a CT scan of Plaintiff's abdomen and pelvis, and stent removal; Dr. Tidwell wrote a consult for those procedures on January 20, 2005.

On January 31, 2005, Plaintiff was sent for a CT scan.  On February 8, 2005, Dr. Tidwell saw Plaintiff at a chronic care appointment, and discussed removal of the catheter.  On February 11 and 15, Plaintiff was seen at sick call complaining that the catheter was not draining properly, and staff flushed it.

On February 25, 2005, Plaintiff returned to the urologist for a CT scan and stent removal.  Between February and December 2005, Plaintiff was seen by various medical personnel and provided treatment, in consultation with Dr. Tidwell.  The last consultation

Plaintiff personally had with Dr. Tidwell before September 2005 was on February 8, 2005.

In August 2005, Plaintiff was seen by a mid-level practitioner (MLP), complaining of leg pain.  Dr. Tidwell recommended treatment with Augmentin, ordered a CBC, and ordered an ultrasound, which was completed on August 18, 2005.  The ultrasound revealed a DVT.  Plaintiff was prescribed medication and scheduled for follow-up.

On October 14, 2005, a MLP put Plaintiff back on coumadin and he was placed in the coumadin clinic.  Dr. Tidwell examined Plaintiff on October 17, and determined that Plaintiff's chronic renal insufficiency was stable.  Dr. Tidwell observed edema in both of Plaintiff's legs, adjusted Plaintiff's medication, and told Plaintiff that support stockings had been ordered and that Dr. Tidwell was also investigating use of a pneumatic compression unit for Plaintiff.  Dr. Tidwell subsequently determined that a compression unit was contraindicated due to Plaintiff's existing blood clots.  On November 4 and 10, Plaintiff was again seen by MLPs.  Plaintiff's records reflect that he was treated between December 2005 and March 2006 by medical staff for complaints of an infection in his left leg.  Dr. Tidwell saw Plaintiff on February 27, 2006, and ordered dressings, saline patches, and diagnostics.

Defendant argues that there is nothing in Plaintiff's medical records reflecting any imminent order for a procedure to reduce the size of Plaintiff's prostate from either a 2002 urology consultation or the 2004 urology consultation.  Moreover, Defendant contends that Dr. Tidwell fully complied with the consulting urologists' recommendation that Plaintiff should have a biopsy to rule out cancer prior to having the prostate reduction.  Defendant argues that the records reflect that Plaintiff received ongoing and

14

appropriate care for his medical conditions, and do not in any way reflect deliberate indifference to Plaintiff's medical needs.

## VIII. <u>Plaintiff's Response to the Motion</u>

In response to Defendant's motion, Plaintiff states that he "does not contest the authenticity" of the medical records submitted by Defendant, but that "Plaintiff is concerned as to the completeness of these records."  Doc. 34.  Plaintiff does not, however, explain in what regard the records are incomplete with regard to his claims. Plaintiff further states that "[i]f the Court intends to render a decision based on these documents submitted by the Defendant, the Plaintiff should be given an opportunity to have Plaintiff's expert Dr. Jay S. Copeland review the records and provide the Court with his expert medical opinion regarding same."  <u>Id</u>.

After Defendant filed the instant motion, the Court issued to the parties a Summary Judgment Notice, setting forth the requirements of Rule 56 and reminding the parties that "all material facts asserted by the movant in the motion will be considered to be admitted by you unless controverted by proper evidentiary materials . . . ; you may not rely solely on the allegations of the issue pleadings . . . in opposing this motion." Doc. 33.

Despite being so warned, Defendant restates the facts as alleged in the Amended Complaint, and argues that by the time Plaintiff had his prostate reduction, Dr. Tidwell "had ignored the serious and critical medical condition of the Plaintiff for a period of over (six) 6 months."   Doc. 32.  Plaintiff contends that he "provided the expert opinion of Dr. Jay S. Copeland M.D., a board certified urologist, which establishes to a reasonable degree of medical certainty, 'that the entire course of medical treatment and

15

subsequent sequelae would have been avoided if Mr. Fischer underwent routine prostatic surgery for his obstructive uropathy as had been recommended.'"   Doc. 34. The only statement in the record from Dr. Copeland was submitted in connection with Plaintiff's opposition to Defendant's first motion to dismiss.  See Doc. 12.  In that statement, Dr. Copeland opines that he reviewed Plaintiff's medical records and that in his opinion Plaintiff's November 20, 2004, hospitalization was precipitated by "untreated obstructive uropathy secondary to an enlarged prostate," and that Plaintiff's complications would have been avoided had he earlier received prostate surgery.  Dr. Copeland concludes that "[t]here was negligence by Dr. Tidwell and his staff in not providing the necessary medical care that [Plaintiff] requested and had been advised to undergo."  Id.

## IX.  Discussion

As stated, a deliberate-indifference claim must be predicated on something more than gross negligence.  Goebert, 510 F.3rd at 1326.  The evidence relied on by Plaintiff – Dr. Copeland's statement – reflects that Dr. Copeland disagrees with Dr. Tidwell's treatment decisions, but cannot under any fair reading support a determination that Dr. Tidwell was deliberately indifferent to Plaintiff's medical needs in violation of his Eighth Amendment rights, and that such deliberate indifference caused Plaintiff's November 20, 2004, hospitalization and subsequent medical complications.

Dr. Tidwell's treatment chronology reflects that upon observing an increase in Plaintiff's creatinine level in June 2004, he referred Plaintiff for a urology consult, which resulted in a recommendation for a prostate procedure if a biopsy was negative for cancer.  Such biopsy could not be performed immediately because Plaintiff was taking

coumadin.  Plaintiff was taken off of coumadin so that the biopsy could be performed, resumed coumadin treatment after the biopsy in accordance with the consultant's recommendation, and Dr. Tidwell received the negative biopsy results on November 10, 2004.  Plaintiff became ill and was hospitalized ten days later on November 20, and according to Dr. Tidwell such hospitalization was due to complications from the anticoagulopathy treatment (coumadin) and not from Plaintiff's prostate condition.

The evidence submitted by Defendant thus supports a conclusion that Dr. Tidwell recognized that Plaintiff's medical needs concerning his prostate condition were serious, and took ongoing steps to address such needs in the exercise of his medical judgment, including referring Plaintiff for urology consults and following the consultant's recommendation that Plaintiff should have a prostate biopsy prior to scheduling him for prostate reduction.  In the face of Defendant's summary judgment evidence, Plaintiff offers no evidence sufficient to support a conclusion that Dr. Tidwell's treatment reflects an intentional disregard of a risk of serious harm to Plaintiff which caused Plaintiff's November 20, 2004, medical emergency, or that Dr. Tidwell evinced deliberate indifference to Plaintiff's serious medical needs with regard to any subsequent treatment.[9]  See Goebert, 510 F.3d at 1326.  Dr. Copeland's assertion that Dr. Tidwell's treatment was "negligent" is simply insufficient to sustain an Eighth Amendment claim. See Estelle, 429 U.S. at 105-06 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").  Thus, Plaintiff has failed to carry his

---

[9] In his response to Defendant's motion, Plaintiff does not address any of his claims concerning Dr. Tidwell's treatment of Plaintiff's blood clots.

summary judgment burden on the essential subjective component of his deliberate-indifference claim.  See Goebert, 510 F.3rd at 1326.  Defendant is therefore entitled to summary judgment.[10]

## X. **Conclusion**

For the reasons set forth in this Order, the Defendants' Motion to Dismiss, or in the alternative for Summary Judgment (Doc. 32) is **GRANTED**.  The Clerk is directed to enter judgment in Defendant's favor, terminate any pending motions, and close the file.

**DONE AND ORDERED** at Ocala, Florida, this 23rd day of September 2008.

_____
GARY R. JONES
United States Magistrate Judge

c:    Counsel of Record

---

[10] Because Plaintiff has failed to establish a constitutional violation, it is unnecessary to address Defendant's further argument that he is entitled to qualified immunity from suit.  See Goebert, 510 F.3d at 1329 .